**In the Matter of WM. GLUCKIN COMPANY LIMITED, Debtor.**

**In the Matter of WM. GLUCKIN & CO., INC., Debtor.**

**In the Matter of PITTSTON APPAREL COMPANY, Debtor.**

**No. 73 B 194 (CES).**

United States District Court, S. D. New York.

Sept. 27, 1978.

Milbank, Tweed, Hadley & McCloy, New York City, for Lenders by John J. Jerome, David C. L. Frauman, Alan W. Kornberg, New York City, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for Trustee Philip Mandel by Joel B. Zweibel, David C. Unger, New York City, of counsel.

MEMORANDUM DECISION

STEWART, District Judge:

The First National Bank of Boston and the John Hancock Mutual Life Insurance Company (the "Lenders") have applied to this Court for an order·directing the Trustee of the estates of Wm. Gluckin Co. Ltd., Wm. Gluckin & Co., Inc. and Pittston Apparel Co. (the "Debtors") to pay over to the

Lenders in the form of an interim distribution at least 90% of the total sum available for distribution. The Lenders assert that such distribution is warranted (1) because other competing claims, specifically the so-called intercompany claims, should be barred as untimely; or (2) because they have priority arising from certain Factor's Liens, Security Agreements or other guaranties.

I

Briefly, the facts are as follows. Wm. Gluckin Co. Ltd., the parent company, Wm. Gluckin & Co., Inc. and Pittston Apparel Co., affiliated companies, filed petitions in late February, 1973, instituting proceedings pursuant to Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 *et seq.* Until that time, and for some time thereafter, Debtors were involved in the manufacture of women's undergarments along with various other affiliated corporations located in the Commonwealth of Puerto Rico., namely: Wm. Gluckin & Co., Inc. of Puerto Rico, Bra-Glo Mfg. Co., Inc., Harjon, Inc., Harjon, Inc. # 2, Tedros Corporation, Lyntris Corporation, Debmar Corporation and Chico Realty Corporation (collectively referred to as the "Puerto Rican Affiliates"). No petitions in bankruptcy have been filed by or on behalf of the Puerto Rican Affiliates even though they have been for all practical purposes dormant for several years. Some sixteen months after the three Debtors filed their petitions, they ceased operations and were liquidated. Since that time, approximately four years ago, the Trustee has held the proceeds of that liquidation in cash or cash equivalents, except for a sum of $1,800,000 released by the Trustee to the Lenders pursuant to an Order of this Court dated October 25, 1977, representing the proceeds of the "Domestic Security" (an issue unrelated to the Lenders' present application for an interim distribution).

As all parties seem to agree, the major stumbling block in the present context is the "intercompany claims"; claims asserted by the various Puerto Rican Affiliates against the Debtors totalling some $15,442,378. These claims were the result of a complex series of transactions among the various corporate entities, the substance of which appears to be that Wm. Gluckin Co., Inc. ("Gluckin", a New York corporation) financed the purchase and manufacture of materials and eventually took responsibility for selling the finished products while the various Puerto Rican Affiliates were used essentially as "contracting" services (and, at least in the case of Bra-Glo, for purchasing materials with funds advanced by Gluckin) (Trustee's Exhibit A).

The claim of the Lenders against the Debtors is currently about $4,700,000 (reduced from the initial $6,500,000 by the $1,800,000 distribution referred to above) and arises from various loans made to Gluckin to finance operations. The Lenders also assert a claim of $6,500,000 against each of the Puerto Rican Affiliates pursuant to Factor's Liens, Security Agreements and/or other guaranties (*See*: Lenders' Exhibit B for copies of the various agreements). It is the Lenders' contention that (1) the intercompany claim is time barred; and (2) even if it is not so barred, the Lenders have priority because of their various liens or other forms of security against each of the Puerto Rican Affiliates [1] and therefore an interim distribution is warranted. It is the Trustee's contention that (1) the intercompany claims are timely and valid; (2) this Court lacks jurisdiction to determine the validity of the Lenders' claims or liens against the Puerto Rican Affiliates since they are not the debtors in these cases; and (3) even if this Court does have sufficient jurisdiction, at the present time there is enough uncertainty as to the validity of Lenders' claims and liens against the Puerto Rican Affiliates to justify delaying any distribution until bankruptcy proceedings can be instituted on behalf of those Affili-

1. Any security agreements, guaranties or liens which the Lenders may have against the Debtors themselves is not an issue for purposes of the present application.

ates.[2]  As might be expected, the amount to which the Lenders would be entitled varies widely depending on the status of the intercompany claims.  If the claims were valid, the Lenders would receive only about 20% of the $715,000 available for distribution; otherwise, they would be entitled to 90% or more.

## II

Pursuant to an Order dated July 24, 1973, as amended (the "Bar Order"), this Court called for all claims to be filed by August 27, 1973, a date which has long since expired.  No claims were filed by or on behalf of the Puerto Rican Affiliates relating to the $15,442,378 intercompany claim.  These claims, however, were noted in timely fashion by the Trustee in his "List of Shareholders and Creditors" filed with this Court March 21, 1973, well before the bar date.

Section 224(4) of the Bankruptcy Act, Chapter X, 11 U.S.C. § 624(4) provides:

distribution shall be made, in accordance with the provisions of the plan, to creditors and stockholders (a) proofs of whose claims or stock have been filed prior to the date fixed by the judge and are allowed, or (b) if not so filed, whose claims or stock have been listed by the trustee or scheduled by the debtor in possession and are not contingent, unliquidated or disputed.

It has been held that by amending § 224(4) to its present form, "Congress intended to permit a creditor  .  .  .  to share in the distribution, despite its failure to file its claim, if its claim has been listed by the trustee and is, *in fact,* not contingent, unliquidated or disputed."  *In re La Crosse Trailer Corp.,* 279 F.Supp. 735, 737 (W.D. Wis.1968) (emphasis added).  Thus under § 224(4), the intercompany claims will be entitled to distribution, even though never filed, if they are *in fact* not disputed.  In their Reply Memorandum (p. 16), Lenders assert that the claims have been disputed "since the commencement of these proceedings."  As pointed out in oral argument, however, the Trustee has never disputed the intercompany claims.  Transcript at 35.  Since the Trustee, who is closest to the information and who has the duty of examining claims and allowing or disallowing them, has not disputed the intercompany claims thus far, we cannot say on the present record that the claims are so disputed *in fact* as to bar them from distribution pursuant to § 224(4).  Mindful of both the Trustee's fiduciary office and Congressional policy that Chapter X seeks the preservation rather than the forfeiture of claims, this Court, in the presence of a close question, is inclined to give the benefit of the doubt to the Trustee's position which will preserve the intercompany claim, at least for the present time.

The main thrust of the Lenders' argument, however, is directed, not at invalidation under § 224(4), but pursuant to Rule 10–401, Rules of Bankr.Proc.Rule 10–401, 11 U.S.C.A.[3]  It is their contention that (1)

---

**2.**  A related contention is that creditors of the Puerto Rican Affiliates may be adversely affected by a determination that the intercompany claims are invalid or subordinate notwithstanding the Lenders' offer of a stipulation agreeing to reimburse any amount later found to be an overpayment.  Like the Affiliates themselves, these creditors are not before the Court and have not participated in any way nor have they received any notice.

**3.**  The pertinent part of Rule 10–401 is as follows:

Proof of Claim or Interest

(a) List of Creditors and Stockholders.  The list of creditors and stockholders prepared and filed with the court pursuant to Rule 10–108 shall constitute prima facie evidence of the validity and amount of claims of creditors which are not listed as disputed, contingent, or unliquidated as to amount, and of stock interest and, except as provided in subdivision (b)(3) of this rule with respect to claims, it shall not be necessary for the holder of such claim or stock interest to file a proof of claim or interest.

(b) Filing Proof of Claim.

(1) Time for Filing.  A proof of claim may be filed at any time prior to the approval of a plan except that the court may fix a different bar date for the filing of claims on notice as provided in Rule 10–209.

(2) Who May File.  Any creditor or indenture trustee may file a proof of claim within the time prescribed by subdivision (b)(1) of this rule.

(3) Who Must File.  (A) Any creditor, including the United States, a state, or any subdivision thereof, whose claim is listed as

Rule 10–401 should be applied retroactively[4] to the present case; and, (2) if so applied, that Rule will invalidate the intercompany claim as untimely. The Order of the Supreme Court of the United States dated April 28, 1975 provided that the Chapter X Rules "shall be applicable to proceedings then pending except to the extent that in the opinion of the court their application in a particular proceeding then pending would not be feasible or would work injustice, in which event the former procedure applies." 421 U.S. 1021 (1975).

It is difficult to see how, if Rule 10–401 would indeed bar the claims of the Puerto Rican Affiliates, that anything but injustice would be worked. Claims that were timely listed by the Trustee and as such under prior practice would be entitled to distribution, suddenly by retroactive application are invalidated. The Lenders argue that this result could have been prevented by the Trustee petitioning the Court for an extension of time pursuant to Rules 906(b) and 10–901, and then if such petition were granted,[5] proceed to file the claims on behalf of the Puerto Rican Affiliates. Reply Memorandum at 15. While such a series of events might have been feasible, it certainly would not have been sensible. The Lenders offer no persuasive reasons why the Trustee should take both his and this Court's time by petitioning for the right and filing against himself claims that all parties already have sufficient notice of and are already duly listed in accordance with the procedure applicable at the time. The Lenders show no benefit that would have been achieved from this empty, formalistic ceremony and yet still contend that failure to follow such procedure warrants invalidation of the intercompany claim. It is the opinion of this Court that where no benefit can be achieved and only forfeiture of previously valid claims can result, an injustice within the meaning of the Supreme Court's Order of April 28, 1975 has been worked and Rule 10–401 cannot be applied to this particular proceeding.

■ Finally, it should be noted that even if Rule 10–401 were to apply, the claims of the Puerto Rican Affiliates would still be valid. The Lenders rely on Rule 10–401(b)(3)(B) as support for their position that Rule 10–401 bars the intercompany claim.[6] Such reliance, however, is misplaced. Subdivision (b)(3)(B) provides for the case where after the claim has been listed as not disputed, a question as to its validity arises. In such a case the Court may require the filing of a formal claim by a specific date. However,

"The [date] does not refer to the bar date fixed pursuant to subdivision (b)(1) of the Rule. The court fixes a time for the filing of a specific claim or claims, and if the person so required to file a proof of claim fails to do so, he will not be treated as a creditor for the purposes of voting and distribution."

*Collier on Bankruptcy,* ¶ 10–401.04[3.2]. The Lenders make no showing that the intercompany claims were subject to any filing date other than the general bar date. Thus Rule 10–401(b)(3)(B) does not operate

---

disputed, contingent, or unliquidated as to amount, shall file a proof of claim within the time prescribed by subdivision (b)(1) of this rule; any such creditor who fails to do so shall not, with respect to such claim, be treated as a creditor for the purposes of voting and distribution.

   (B) Notwithstanding the foregoing, the court may, at any time, require the filing of a proof of claim within such time as it may fix. Any person required under this paragraph to file a proof of claim who fails to do so shall not, with respect to such claims, be treated as a creditor for the purposes of voting and distribution.

4. Rule 10–401, along with the other Chapter X Rules, took effect on August 1, 1975, almost two years after the original bar date of August 27, 1973.

5. Rule 906(b) made applicable to Chapter X proceedings through Rule 10–901 states that the enlargement of time is a matter of the court's discretion.

6. It is clear that Rule 10–401(a) would not bar the claims since they appear in the "List of Shareholders and Creditors" and are not *listed* as disputed. Furthermore, Rule 10–401(b)(3)(A) also permits validation of the present claim since it requires only claims *listed* as disputed, etc. to be filed.

in the present case. And as already noted (*See*: footnote 6), neither Rule 10–401(a) nor 10–401(b)(3)(A) would bar the present claims. Thus even if, in the opinion of the Court, Rule 10–401 should be applied, it will not achieve the result desired by the Lenders.

### III

■ Our decision as to the intercompany claims does not entirely dispose of the issue of the appropriateness of an interim distribution. The Lenders contend that even if the claims are valid, they still have prior claim to the proceeds of those claims arising from their various forms of security and liens against the Puerto Rican Affiliates.[7] To state the claim of the Lenders as having priority, however, is somewhat misleading. In reality the course of events would begin with the Lenders competing on an even par with the Puerto Rican Affiliates and all other unsecured creditors entitled to distribution for their pro rata share of the proceeds available, the $715,000. Then the Lenders would assert claims against the Affiliates based on their various liens, guaranties and/or security agreements. In effect, what the Lenders urge this Court to do is take a short cut to that end result and declare, or direct the Trustee to declare, that because valid liens, etc. exist against the Affiliates, the Lenders might as well receive their money now, directly from the Debtors' estates, rather than through the more circuitous route of the Affiliates' estates. While this "short cut" has the appeal of expediting these already long and over-drawn proceedings and allowing a distribution to creditors who have been waiting years for their money, we hold that an interim distribution would not be appropriate based on the various liens, guaranties and security agreements on the grounds that this Court lacks jurisdiction to deal with the property of the Puerto Rican Affiliates, who are not debtors in the present proceeding, and are not before this Court.

■ It is plain that the application of the Lenders seeks to determine the validity of liens, guaranties and/or security agreements entered into, not between any Debtor which is currently before this Court and the Lenders, but between the Lenders and separate, albeit affiliated, corporations. Mere corporate affiliation with the Debtors will not support this Court's extension of jurisdiction beyond parties involved in the present proceedings. In short, "Congress did not give the bankruptcy court exclusive jurisdiction over all controversies that in some way affect the debtor's estate." *Callaway v. Benton,* 336 U.S. 132, 142, 69 S.Ct. 435, 441, 93 L.Ed. 553 (1949). Similarly, the more recent cases of *In re Beck Industries, Inc.,* 479 F.2d 410 (2d Cir.) *cert. denied,* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973) and *In re Unishops, Inc.,* 494 F.2d 689 (2d Cir. 1974), cited by both parties, stand for the proposition that the Court lacks jurisdiction to interfere with state proceedings by a creditor against a subsidiary of the debtor by enjoining those proceedings. If a court cannot interfere with a creditor's attempt to enforce the obligations of a debtor's subsidiary, a *fortiori,* it cannot itself assert jurisdiction on the application of a creditor and determine the result in what amounts to an *ex parte* proceeding.

The result of the *Beck* and *Unishops* cases depends, however, on the fact that the

---

**7.** As to each of the eight Puerto Rican Affiliates identical documents (differing in name of corporation only) are included in Lenders' Exhibit B. These documents include: (1) a Guaranty in favor of John Hancock and other insurance companies (who have since subordinated their claims to Hancock), but not in favor of First National Bank of Boston. Each Affiliate guarantees the obligations of Wm. Gluckin Company Limited; (2) a Security Agreement granting security interests in equipment, machinery, inventory, accounts receivable and other tangibles *and intangibles to* First National Bank of Boston for itself and on behalf of Hancock and other insurance companies; (3) a Factor's Lien in favor of First National *for itself and on* behalf of Hancock and other insurance companies on all inventory, work in process, finished goods, supplies, accounts receivable and other assets; and (4) a Statement of Assignment of Accounts Receivable in favor of First National for itself and on behalf of Hancock and other insurance companies. With the exception of the Guaranties which were entered into in January, 1971, all agreements stem from the first half of 1972.

384

subsidiaries involved "cannot be characterized as shams." *Unishops* at 690. Based on the factors outlined in *Beck* at 417, the Puerto Rican Affiliates might not enjoy the same degree of independence as the subsidiary in that case and an argument might have been made that this is an appropriate case for "piercing the corporate veils" which would allow this Court to assert jurisdiction over those subsidiaries on the basis of their being mere shams. However, the Lenders have failed to sustain their burden of proving that the Puerto Rican Affiliates are mere shams or instrumentalities of the Debtors. Their only offering in this regard is that the Trustee must recognize this fact because he argues that future proceedings in bankruptcy for the Affiliates "could be substantively consolidated." Reply Memorandum at 6. While many of the considerations leading to a decision to consolidate, (*See: Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir. 1966)) may also lead to a conclusion that corporate identities should be disregarded, such a conclusion is not compelled. The standard for consolidation—that "the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors," *Chemical Bank* at 847—does not require any "piercing of the corporate veil." Thus the only "evidence" offered by the Lenders falls short of a showing that the Puerto Rican Affiliates were mere shams or instrumentalities so as to allow the Court to avoid the general rule of the *Beck* and *Unishops* cases and assert jurisdiction for the purpose of determining the validity of the liens, etc.

## IV

Our disposition of this matter on the grounds of lack of jurisdiction makes unnecessary an inquiry into the Trustee's further contention that the various liens and other forms of security held by the Lenders may be defective. Presumably this issue will receive proper treatment upon the institution of bankruptcy proceedings on behalf of the Puerto Rican Affiliates. We

also need not reach the Lenders' argument that paragraph 7 of the Security Agreement requires the Trustee to execute the documents necessary to reinstate the lapsed assignments of Accounts Receivable.

The application of the Lenders for an interim distribution is denied in all respects.

SO ORDERED.