**In re DRW PROPERTY CO. 82 d/b/a Apache Arms (The Single Original Hereof Shall Be Deemed Filed Under Each Partnership Debtor and In Each Case Listed In the Caption of the Order Procedurally Consolidating Cases For Certain Administrative Purposes Entered on March 29, 1985 and as Supplemented on April 10, 1985), Debtor.**

**In re OAKS II OF JACKSONVILLE, LTD. d/b/a Oaks II, Debtor.**

**In re OAKS II OF JACKSONVILLE, LTD. d/b/a Oaks III, Debtor.**

**In re RIVER RUN ASSOCIATES, LTD. d/b/a River Run, Debtor.**

**Bankruptcy Nos. 485–40510, 485–40743, 485–40744 and 485–40742.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Oct. 30, 1985.

Robin Phelan, Haynes & Boone, Dallas, Tex., for movants/debtor partnerships.

Steve McCartin, Gardere & Wynne, Dallas, Tex., for Donald R. Walker.

George McElreath, U.S. Trustee's Office, Asst. U.S. Trustee, Dallas, Tex., for U.S. Trustee.

Philip Pierce, Booth, Marcus & Pierce, New York City, Arthur Ungerman, Ungerman & Vickers, Dallas, Tex., for Official Investors Committee.

Linda Groves, Dept. of Justice, Tax Div., Dallas, Tex., for I.R.S.

Edward L. Rothberg, Lapin, Totz & Mayer, Houston, Tex., for Corporate Investments, Inc.

Bruce S. Zeftel, Saperston, Day, Lusting, Gallick, Kirscher & Gaglione, P.C., Buffalo, N.Y., Deborah K. Poole, Vetter, Bates, Tibbals, Lee & Debusk, Dallas, Tex., for Goldome FSB.

Richard G. Dafoe, Vial, Hamilton, Koch & Knox, Dallas, Tex., for United Bank, N.A.

Sheldon S. Toll, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for Multivest Real Estate Fund, Ltd., Series IV.

Van Oliver, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for Creditors having junior mortgages against the Falls Apartments, Kingsley Arms, Country Squire Manor, Wadsworth Hills and Three Fountains Apartments.

Andrew E. Jillson, Jenkins & Gilchrist, Dallas, Tex., for Intervest London, 1 Meandering Way.

Thomas S. Henderson, Sheinfeld, Maley & Kay, Houston, Tex., for Consol. Capital Special Trust, Consol. Capital Realty Investors.

Alan Liebel, Brice, Mankoff & Barron, Dallas, Tex., for Buerkle Inv. Corp.

Lewis Goodman, H. Dewayne Hale, Strasburger & Price, Dallas, Tex., for USA, II Lehndorff Vermoegen-Sverwahung, RIMJ/Mortgage Service Corp. and Trails Associates, Ltd.

Gerrit M. Pronske, G. Michael Curran, Sheinfeld, Maley & Kay, Dallas, Tex., for Integrity Ins. Co.

Donald R. Rector, Nancy Ratchford, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for Monumental Life Ins. Co.

Peter J. Harry, Geary, Stahl & Spencer, Dallas, Tex., for Morrow College Apartments Ltd. Partnership and Charlotte Woods Apartments Ltd. Partnership.

Robert W. Kantner, Baker & Botts, Dallas, Tex., for Hugh Culverhouse.

Frank A. St. Claire, Dallas, Tex., for PMA/Debot Apartments, Ltd.

Alice Nystel, Rochelle & King, Dallas, Tex., for Hunter Sav. Assn.

## MEMORANDUM OPINION REGARDING MOTION FOR SUBSTANTIVE CONSOLIDATION

MICHAEL A. McCONNELL, Bankruptcy Judge.

### PROCEDURAL BACKGROUND

Between March 25, 1985 and May 31, 1985, the eighty-five above-referenced part-nerships filed voluntary petitions under Chapter 11 of the Bankruptcy Code. Donald R. Walker ("Walker"), a Dallas real estate developer and syndicator, was the individual general partner for each of the partnerships. In addition, each of the Debtor partnerships has at least one corporate general partner, consisting of a corporation whose stock is wholly-owned by Walker. The various Debtors have maintained management and control of their assets pursuant to 11 U.S.C. § 1107, and, on March 29, 1985, the Court "procedurally consolidated" the Debtor partnerships solely for administrative convenience in accordance with Bankruptcy Rule 1015(b).

During the preliminary stages of the cases, the Court established a deadline of September 1, 1985 pursuant to Section 1112(b)(4) of the Code for the Debtors to file Plans of Reorganization in each of the above cases. In anticipation of the filing deadline, counsel for the Debtor partnerships then filed an Application for Substantive Consolidation requesting the Court to substantively consolidate the Debtor entities with one hundred and nine related *non-debtor* partnerships so as to form a single limited partnership effective January 1, 1982 for all purposes including, without limitation, federal income tax purposes. The Application further requests a final determination that all assets and liabilities of the consolidated partnerships were "merged" into the consolidated partnership as of January 1, 1982 (over three years prior to the bankruptcy filings). Counsel for the Debtor partnerships petitioned the Court to render its decision on their Application for Substantive Consolidation before the deadline for filing their Plans of Reorganization.

The Court originally scheduled the Debtors' Application for Consolidation for hearing on August 28, 1985. At that time, however, various parties including the Internal Revenue Service, (the "IRS"), and the U.S. Trustee for the Northern District of Texas, presented Motions for Continuance and requested the Court to delay hearing the Debtors' motion until they had

time to review certain of the Debtors' records which the Debtor's counsel had just made available. The Court granted the Motions for Continuance and rescheduled the hearing for September 19, 1985.

The Court then conducted an evidentiary hearing on the Debtor's Application for Substantive Consolidation on September 19, 1985, September 30, 1985, and October 1, 1985. This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law, and for the reasons discussed herein, the Court denies the Debtor's Application for Substantive Consolidation.

## FACTUAL BACKGROUND

Over a three-year period beginning in 1981, Donald R. Walker created a real estate syndication "empire" composed of approximately two-hundred general and limited partnerships for the purpose of investing in apartment complexes and office buildings. In order to exercise control over his organization, Walker also formed six wholly-owned corporations and assigned them specific investment and management functions.

DRW Investments, Inc., a wholly-owned Walker corporation (the "Investment Company"), syndicated the real estate investments through general and limited partnerships. Investors were solicited through "private placement" memoranda similar in form to Debtors' Exhibits 6 and 7. Between January 1981 and March 1985, the Investment Company organized the Debtor partnerships involved herein. Each Debtor entity owns a single asset consisting of either an income-producing property, (such as an office building or apartment complex), or a note given in consideration for the sale of such a property. Two of these partnerships have previously sold properties, while 83 of them, (64 of which are general partnerships and 21 of which are limited partnerships), currently own apartment complexes or office buildings located in seven states.

The Investment Company initially formed limited partnerships which offered investors/limited partners investments in pre-determined, specified properties ("Specified Offerings"). However, from at least January 1, 1982 until March 1985, the Investment Company also formed limited partnerships which offered limited partner/investors investments in undetermined, unspecified real estate properties ("Unspecified Offerings"). The private placement memoranda issued by such partnerships gave discretion to the General Partner, Walker, in choosing the property or properties in which the partnership would ultimately invest.

The Investment Company utilized both "one tier" and "two tier" partnership structures to acquire an apartment project or office building for purposes of syndication. In a typical "one tier" scheme, the Investment Company would organize a single limited partnership to purchase an income-producing property. This limited partnership, or "Project Partnership," would own fee simple title to the property in its own name, and no other limited or general partnership would claim an interest in either the property or the Project Partnership itself. The Investment Company followed basically the same procedure in creating "two tier" partnerships, in that it would form a limited or general partnership to purchase and hold title to an apartment complex or office building in its own name. The Investment Company would then form second-tier partnerships to purchase interests in the Project Partnership, which would, in turn, sell limited partnership units to investors/limited partners. The General Partners also required certain partnerships unilaterally to pledge assets to secure loans which were used as working capital infusions for the partnerships as a whole. Donald R. Walker, individually, and, in most instances, a corporation wholly-owned by Donald R. Walker, served as managing General Partners for the Project Partnerships.

As the Investment Company's syndication business began to mushroom in late 1982 and early 1983, the General Partners

of the various Debtor entities developed a series of interest allocation and accounting practices which muddled the relationships of the Debtor partnerships significantly. The General Partners of the two-tier Project Partnerships would either over-subscribe the Partnerships or assign inconsistent interests therein to the investing limited partnerships. The General Partners would then comingle the contributions of investors by depositing them into a single concentrated cash account held by the Investment Company.

Moreover, while the deed records reflect which entities hold record title to the various partnership properties, neither Walker nor the other General Partners executed formal written assignments of interests in the partnerships to the investors/limited partners. The only evidence offered by the Debtors regarding such assignments consists of a handwritten list (Debtor's Exhibit No. 10), allegedly prepared by Walker which allocates percentage interests among various limited partners.

The Investment Company also formed DRW Realty Services, Inc., a corporation wholly-owned by Walker, which managed the properties owned by the Debtor partnerships until shortly after the bankruptcy filings. DRW Services, Inc. deposited rental receipts from the various Debtor properties into separate local bank accounts, but it transferred these funds by check or wire to the DRW Realty Services, Inc. "concentrated cash account". This account was used to pay maintenance and operating expenses as well as interest on indebtedness for the various properties.

DRW Realty Services, Inc. contracted directly with vendors and trade creditors who performed labor and/or services needed in the operation and maintenance of the properties. These vendors and trade creditors dealt with the Debtor partnerships through DRW Realty Services, Inc, and they provided services to numerous partnership apartment complexes without differentiating as to the ownership of the properties for billing purposes. Between June 1984 and December 1984, between $7,000,000 and $8,000,000 of comingled investor funds deposited in the Investment Company concentrated cash account were transferred to DRW Realty Services, Inc. in order to pay for capital improvements, repairs, and debt service on properties which were unable to generate sufficient rental revenue to pay their liabilities. Neither DRW Realty Services, Inc. nor the Investment Company is included in the Debtor's Application for Substantive Consolidation.

*Contentions of the Parties*

There are approximately 5,500 limited partners/investors in both the one tier and two tier partnerships who have invested, in the aggregate, approximately $165 million. By virtue of the comingling of the various debtor partnership accounts and the inept manner in which the general partners allocated limited partnership interests in the two-tier project partnerships, counsel for the Debtor partnerships claim that the interrelationships of the Debtor partnerships are hopelessly obfuscated and that the expense necessary to unscramble them severly threatens, and may defeat, the realization of any net assets for the creditors. Counsel for the Debtor partnerships further claim that unless the Court grants their Application for Substantive Consolidation, an effective reorganization of the various entities will be impossible. Finally, the Debtors claim that substantive consolidation will enable the preparation of income tax returns for the years 1983 and 1984. The Application for Substantive Consolidation is actively supported by the IRS and the Official Investment Committee.

Conversely, various secured creditors oppose the Application arguing that the harm which they will suffer as a result of substantive consolidation will outweigh any benefit which they will derive therefrom. They further assert that substantive consolidation will not only detrimentally affect their liens and security interests in certain partnership assets but will also place their

unsecured deficiency claims at risk. Moreover, the United States Trustee has also entered an objection to substantive consolidation on grounds that it will, in effect, dictate certain terms of a future Plan of Reorganization *sub rosa*.[1]

The Court must determine, therefore, whether the alleged inability of the various debtor entities not only to specify the ownership interests attributable to the investors/limited partners but also to reconcile inter-partnership accounts constitutes sufficient cause to grant substantive consolidation. The Court must make this determination within the context of whether the harm which substantive consolidation will cause to creditors will outweigh the benefits which it will provide to all parties concerned. The Court must also determine whether the exercise of its equitable powers under 11 U.S.C. § 105 to grant substantive consolidation outside of a plan of reorganization is consistent with the suffrage rights of creditors mandated in Chapter 11 of the Bankruptcy Code.

## LEGAL ANALYSIS

Although the authority of a bankruptcy court to order a "substantive" consolidation is not expressly provided by the Bankruptcy Code or Bankruptcy Rules, many courts have held that bankruptcy courts possess such authority pursuant to their general equity powers as contained in Section 105(a) of the Bankruptcy Code, 11 U.S.C. § 105(a), which authorizes the bankruptcy courts to issue "orders" necessary to carry out the provisions of the Code. *In Re F.A. Potts and Company, Inc.*, 23 B.R. 569, 571 (Bankr.E.D.Pa.1982); *In Re Tureaud*, 45 B.R. 658, 662 (Bankr.N.D.Okla. 1985); *In Re Richton International Corporation*, 12 B.R. 555, 557 (Bankr.S.D.N.Y. 1981); *See also, Chemical Bank New York Trust Company v. Kheel*, 369 F.2d 845, 847 (2nd Cir.1966).

Substantive consolidation not only eliminates inter-company claims of debtor entities but also pools their assets into a common fund against which the creditors of all of the Debtor can assert their claims. *Chemical Bank New York Trust Company v. Kheel, Id.* at 847. Substantive consolidation also has the further effect of eliminating duplicative claims filed against related debtors by creditors uncertain as to where the liability should be allocated. *In the matter of Commercial Envelope Manufacturing Company, Inc.*, 3 B.C.D. 647, 651 (S.D.N.Y.1977).

While the term "substantive consolidation" has a disarmingly innocent sound, it is no mere instrument of procedural convenience, but rather a measure vitally affecting substantive rights. *In Re Flora Mir Candy Corporation*, 432 F.2d 1060, 1062 (2nd Cir.1970). Courts must, therefore, invoke their equitable power to grant substantive consolidation sparingly because of the possibility of unfair treatment of creditors who have dealt solely with the entities having a surplus, as opposed to those who have dealt with those entities having deficiencies. *Chemical Bank New York Trust Company v. Kheel, supra* at 847; *see also, In Re Nite Lite Inns*, 17 B.R. 367, 371 (Bankr.S.D.Ca.1982); *In Re Continental Vending Machine Corp.*, 517 F.2d 997, 1001 (2nd Cir.1975), *cert. denied* 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317. As the court in the case of *In Re Snider Bros, Inc.*, 18 B.R. 230, 234 (Bankr.D.Ma.1982) stated:

> "It must be recognized and affirmatively stated that substantive consolidation, in almost all instances, threatens to prejudice the rights of creditors. *See In Re Coventry Energy Corporation*, 5 BCD 98 (S.D.Ohio 1979). This is so because separate debtors will almost always have different ratios of assets to liabilities. Thus, the creditors of a debtor whose asset-to-liability ratio is higher than that of its affiliated debtor must lose to the extent that the asset-to-liability ratio of the merged estates will be lower."

*See, also, Matter of Lewellyn*, 26 B.R. 246, 251 (Bankr.S.D.Iowa 1982).

*Airways, Inc.*, 700 F.2d 935 (5th Cir.1983), which will be discussed *infra*.

---

1. In her support of her argument, the Trustee refers the Court to the case of *In Re Braniff*

This Court recognizes that it possesses only the jurisdiction and powers expressly or by necessary implication conferred by Congress. *Johnson v. First National Bank of Montevideo, Minnesota,* 719 F.2d 270, 273 (8th Cir.1983). "Although a bankruptcy court is essentially a court of equity, *Kenneally v. Standard Electronics Corp.,* 364 F.2d 642, 647 (8th Cir.1966), its broad equitable powers [contained in Section 105] may only be exercised in a manner which is consistent with the provisions of the Bankruptcy Code. *In Re J.M. Wells, Inc.,* 575 F.2d 329, 331 (1st Cir.1978); *In Re Texas Consumer Finance Corp.,* 480 F.2d 1261, 1265 (5th Cir.1973); *In Re Candor Diamond Corp.,* 26 B.R. 850, 851 (Bankr.S. D.N.Y.1983)." *Id.* at 273. The Court is also mindful of Judge Friendly's admonition in the *Chemical Bank* case that "Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite..." *Chemical Bank New York Trust Company v. Kheel, supra* at 848.

### The Balancing Test

■ Recent cases have enunciated the following balancing test which the courts should use in determining whether to grant a party's motion for substantive consolidation: the benefits of consolidation must outweigh the harm it would cause to creditors. *In Re Donut Queen Inc.,* 41 B.R. 706, 709 (Bankr.E.D.N.Y.1984); *In Re F.A. Potts and Company, Inc., supra* at 569; *Accord Soviero v. Franklin National Bank,* 328 F.2d 446 (2nd Cir.1964); *Chemical Bank New York Trust Company v. Kheel, supra; In Re Commercial Envelope Manufacturing Company, supra; In Re Snider Brothers,* 18 B.R. 230 (Bankr.D.Ma.1982). The parties seeking consolidation bear the burden of proving that any prejudice resulting from consolidation is outweighed by the greater prejudice posed by the continued separation of the estates. *In Re Donut Queen, supra. See also, In Re Snider, supra; Matter of Lewellyn,* 26 B.R. 246 (Bankr.S.D.Ia.1982). "A necessary corallary of this proposition is that it is incumbent upon the party seeking consolidation to demonstrate that it would be prejudiced if the estates were to remain as separate." *In Re Donut Queen, Id.*

■ The Bankruptcy Court in the case of *In Re Vecco Construction Industries, Inc.,* 4 B.R. 407, 410 (Bankr.E.D.Va.1980) culled several elements from a series of district and appellate court decisions which have assisted the courts in determining whether to substantively consolidate affiliated debtor corporations. They are as follows:

1. The degree of difficulty in segregating and ascertaining individual assets and liabilities.

2. The presence or absence of a consolidated financial statements.

3. The profitability of consolidation at a single physical location.

4. The comingling of assets and business functions.

5. The unity of interests and ownership between the various corporate entities.

6. The existence of parent and intercorporate guarantees on loans.

7. The transfer of assets without formal observance of corporate formalities.

This approach has been cited with approval by several courts. *In Re Donut Queen, supra; In Re Foodfair, Inc.,* 10 B.R. 123 (Bankr.S.D.N.Y.1981); *In Re Richton International Corporation, supra; In Re Manzey Land and Cattle Company,* 17 B.R. 332, 337 (Bankr.D.S.D. 1982); *In the Matter of Luth,* 28 B.R. 564, 566 (Bankr.D.Id.1983). Yet these factors, considered alone, should not be dispositive of the issue of substantive consolidation. Rather, they should be evaluated within the larger context of balancing the prejudice resulting from the proposed order of consolidation with the prejudice movant alleges it suffers from debtor's separateness. *In Re Donut Queen, supra* at 709–710.

Counsel for the Debtor partnerships assert that the Court should substantively consolidate the debtor entities because the expense involved in unscrambling their relationships would consume all of the assets

available for the creditors.[2] They also cite the *Chemical Bank v. Kheel, supra,* case as authority for the proposition that economic prejudice affecting specific creditors is most often outweighed by the anticipated cost or futility of straightening out inter-entity transactions. *Chemical Bank v. Kheel, supra.*

The Court in *Chemical Bank* found that substantive consolidation was appropriate "where the inter-relationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any assets for the creditors." *Supra* at 847. But the Court must decide the extent to which the assets of separate entities are found to be hopelessly obscured on a case-by-case basis. *In Re Vecco, supra,* at 410.

In the case of *In Re Commercial Envelope Manufacturing Company, Inc., supra* the Court granted the Debtor's motion for substantive consolidation because of the uncontradicted statements of an accountant witness, Mr. Norwick, who testified as to the difficulty of isolating and ascertaining the individual assets and liabilities of each of the Debtors. Norwick asserted that each of the interrelated companies maintained only arbitrary and inaccurate systems of bookkeeping with no records reflecting the separate status of each individual entity. He further testified as to the "astronomical" cost of performing "an audit as might be necessary to permit one to distinguish between the assets and liabilities of the Debtors." *Id.* at 648.

Expert testimony in the cases at bar reveals that it will take accountants an additional six months at a cost of approximately $2,000,000 to straighten out the books and records of the Debtor partnerships. Thirty-six members of the Arthur Young accounting firm have already invested approximately 5,000 hours in the task. But the Court finds that this task, unlike that confronting Mr. Norwick in the *Commercial Envelope Case, supra,* is not hopeless. According to Don Collum, a partner with the accounting firm of Arthur Young, which was retained by the Investors Committee to trace the application of investor funds, there is a paper trail available to trace substantially all of the rents and investors contributions through the Debtor entities. Mr. Collum testified that rents were recorded by project in a cash receipt voucher and deposited in a separate local bank account for each project. Bank statements are available for each of these approximately 200 accounts. The money from these separate accounts was then transferred by check or wire to the DRW Realty Services, Inc. Concentrated Cash Account. The DRW Realty Services, Inc. Concentrated Cash Account was then used to pay maintenance and operating expenses as well as interest on indebtedness. DRW Realty Services, Inc. maintained two ledgers concerning these payments: an Accounts Payable ledger, which would not only designate the invoice number but also identify the specific project for which the expense was paid; and a check register. All documentation concerning this flow of funds is available and can be used to reconcile accounts by apartment project.

Mr. Collum further testified that investors' contributions were deposited either directly to the DRW Investments Concentrated Cash Account or first to partnership property accounts and then to the DRW Investments Account. Checks off this account were made payable to Walker's personal account for management fees as well as other Walker personal interest. This fund was also used to make principal pay-

---

**2.** In addition, Debtors' counsel asserts implicitly that the Court should substantively consolidate the Debtor partnerships by applying common law principles of piercing the corporate veil. But if the Court were to accept the proposition that the requirements for consolidation are the same as those for piercing the corporate veil, it would have to refer to state law in order to ascertain the requirements for piercing the corporate veil. In a recent *en banc* decision, the Fifth Circuit Court of Appeals held that in order to pierce the corporate veil under Texas law, the Plaintiff must show that the subsidiary was used by the parent for *fraud* or *injustice*. *Edwards Company, Inc. v. Monogram Industries, Inc.,* 730 F.2d 977 (5th Cir.1984). In the case at bar, counsel for the Debtor partnerships has introduced no direct evidence of fraud on Walker's part, and, therefore, cannot sustain their burden of proof.

ments for the purchase of apartment projects. Documentation is available to trace this flow of funds. Mr. Collum also testified that he can identify each investor by partnership and can determine the dollar amounts invested by each investor but cannot determine the interest assigned to each investor. He stated, "I can tell you what went in and what went out, but I can't tell you whose it was."

Because the accounting difficulties presented in this case are confined only to the interests assigned to investors and the ownership and capital accounts, reconciliation of accounts can be done on a property basis, but not a partnership basis. Indeed, Mr. Collum testified that property but not partnership balance sheets were already available. Income tax returns have not been filed for the tax years 1983 and 1984 solely because of allocation problems stemming from the arbitrary manner in which partnership interests were assigned to investors.

■ The Court finds that the inability of the accountants either to ascertain the ownership interests of the limited partnerships or to prepare tax returns for the various debtor partnerships do not, of themselves, constitute sufficient grounds to invoke the exercise of this Court's equity powers. *In Re Flora Mir Candy Corp.*, 432 F.2d 1066, 1063 (2nd Cir.1970). Moreover, the Court finds that, contrary to the assertions of the Debtors, the inter-relationships of the Debtor entities are not obscured to the point that the projected expense to unscramble them further would threaten any recovery whatsoever by the creditors. *In Re Gulfco Investment Corp.*, 593 F.2d 921 (10th Cir.1979). The Court further finds that the harm which creditors will experience as a result of substantive consolidation in this case will outweigh any benefits which it will provide to the parties concerned. On the one hand, substantive consolidation will enable investors/limited partners to file tax returns. On the other, it will relegate some trade creditors with unsecured claims against partnerships holding properties generating positive cash flows to a general class of unsecured creditors with claims against a large limited partnership consisting of properties generating both positive and negative cash flows. Moreover, in the absence of substantive consolidation, secured creditors could look to rents generated from specific properties for payment of deferred maintenance expenses and interest on indebtedness. If the Court were to grant substantive consolidation, the positive cash flows of the good properties would support the deferred maintenance and interest payments on the poor properties.

Finally, this Court is unaware of any statutory or common law authority to substantively consolidate these debtor entities into a single Texas limited partnership *as of January 1, 1982*, some three years *prior* to the commencement of these cases. Likewise, the Court is also unaware of any statutory or common law authority to substantively consolidate debtor and *non-debtor* partnerships. The non-debtor partnerships are certainly well-outside of the scope of this Court's jurisdiction. Any consolidation of non-debtor partnerships would presumably have to be accomplished in conformity with the Texas Uniform Partnership Acts.

### The "Braniff" Question

In addition, if the Court were to grant the Debtors' Application for Substantive Consolidation, it would, in effect, be dictating some of the terms of a future plan of reorganization which might not otherwise be approved by their creditors through the voting process. Subchapter II of Chapter 11, 11 U.S.C. §§ 1121–1129, delineates the basic machinery which Congress has provided for creditor democracy within the debtor reorganization process. These sections allow creditors to vote on proposals which will affect substantive rights for which they have contractually bargained.

The Court believes that if the Debtors wish to reorganize as a single entity, they should include such a proposal, along with the recommendations of the Investors Committee and the IRS, in their proposed Disclosure Statement and Plan of Reorganiza-

tion. Section 1123(a)(5)(c) of the Bankruptcy Code expressly provides that a plan of reorganization may include the merger or consolidation of the reorganized debtor with other entities. If the debtors include such a provision in their plan, their creditors will thus be afforded an opportunity through the disclosure statement and confirmation process to determine for themselves whether consolidation of the Debtor entities is in their respective best interests.

The Court agrees with the arguments raised by the U.S. Trustee in her objection to the extent they relate to the case of *In Re Braniff Airways*, 700 F.2d 935 (5th Cir.1983). In that case, the Fifth Circuit Court of Appeals held that the district court's approval of a transaction substantially changing the composition of Braniff's assets was not authorized outside of a plan of reorganization. The Court stated:

"The Debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization by establishing the terms of the plan *sub rosa* in connection with a sale of assets."

The Court believes that granting substantive consolidation of the Debtor entities outside of a plan of reorganization would not only deprive the creditors of their right to vote on a plan involving a radical restructuring of their rights but also preclude the possibility of alternate methods of reorganization.

The Court is certainly not saying that the *Braniff* decision prohibits all attempts at substantive consolidation outside of a plan of reorganization. The Court is saying, however, that such a motion should not be granted in the absence of compelling equitable considerations such as are lacking in the instant case. Moreover, motions to substantively consolidate prior to a plan of reorganization must also presumably meet the "fair and equitable" standard generally applicable to the restructuring of debtor/creditor relationships under plans of reorganization. *In Re Continental Vending*

*Machine Corp., supra* at 1001; *See also, In Re Aweco*, 725 F.2d 293 (5th Cir.1984).

### CONCLUSION

In conclusion, the Court finds that the Debtor partnerships have not met their burden of proving that the benefits of substantive consolidation will outweigh the harm it will cause to creditors. While the Debtors established that the additional time and expense necessary to unscramble the interrelationships of the Debtor partnerships will be substantial, they did not prove that the task was hopeless. The inability of the Debtor partnerships not only to ascertain the ownership interests of the investors/limited partners but also to file tax returns does not, of itself, constitute sufficient grounds for the Court to invoke its equity jurisdiction and grant their Application for Substantive Consolidation.

Moreover, if the Court were to grant substantive consolidation at this early stage of the proceeding, it would, in effect, dictate some of terms of any future plan of reorganization. In doing so, the Court would deprive the creditors of their right to vote on a transaction which will radically readjust their substantive rights. The Court refuses to invoke its equity jurisdiction so as to accomplish outside the framework of creditor suffrage what should not be done without full disclosure and opportunity to vote.

For the reasons discussed above, therefore, the Debtors' Application for Substantive Consolidation is denied, and an Order shall be entered accordingly.[3]

---

**3.** The prior Memorandum Opinion of this Court, dated October 28, 1985 regarding Motion for Substantive Consolidation is withdrawn and replaced by this Opinion in order to correct minor citation errors, etc.